COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Decker, Judges Huff and Callins
Argued at Richmond, Virginia

PUBLISHED

AMAZON LOGISTICS, INC.

OPINION BY
v.      Record No. 0310-22-2          JUDGE DOMINIQUE A. CALLINS
SEPTEMBER 26, 2023

VIRGINIA EMPLOYMENT COMMISSION, ET AL.

FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
C.N. Jenkins, Jr., Judge

Stephanie Schuster (Patrick A. Harvey; Christopher Ramsey;
Morgan, Lewis & Bockius LLP, on briefs), for appellant.

Elizabeth B. Myers, Assistant Attorney General (Jason S. Miyares,
Attorney General; Leslie A.T. Haley, Deputy Attorney General;
Joshua N. Lief, Senior Assistant Attorney General and Chief, on
brief), for appellee Virginia Employment Commission.

No brief or argument for appellee Ronald Diggs.


Following the submission of an unemployment claim by Ronald Diggs, a Flex delivery

driver for Amazon Logistics, Inc., the Virginia Employment Commission found that Amazon

(i) misclassified Diggs as an independent contractor rather than an employee and (ii) owed

unemployment insurance taxes for Diggs and all similarly misclassified Flex delivery drivers.

Amazon appealed the Commission's decision to the Circuit Court of the City of Richmond,

which affirmed the Commission. On appeal, Amazon argues that the Commission's

determination is unsupported by the evidence and contrary to the law. Specifically, Amazon

contends that the Commission's determination is based on an erroneous application of the 20

factors elaborated under I.R.S. Revenue Ruling 87-41. We disagree and affirm the judgment of

the circuit court.

## I. Procedural History

This matter traces back to an unemployment claim filed by Diggs on July 3, 2019. The Commission found that Diggs failed to establish that he had earnings in two quarters within the January 1, 2018 to December 31, 2018 period and denied his claim. Diggs requested the Commission's reconsideration and supplied his "proof of earnings in 2018." His proof consisted of his 1099 tax forms for 2018 in connection with services rendered for Amazon as a "Flex driver." The Amazon Flex driver program is "an Uber-like system" of independent drivers who deliver Amazon packages.

The Commission assigned a representative to Diggs's case. In August 2019, the representative determined that the work Diggs performed as a Flex driver was employment as defined by the Virginia Unemployment Compensation Act. The "determination also instructed [Amazon] that remuneration paid to Flex drivers should be reported to the Virginia Employment Commission as wages." After considering all the evidence and conducting a 20-factor analysis, the Commission affirmed the representative's determination, finding that Diggs's services constituted employment pursuant to Code § 60.2-212. The Commission further found that Amazon "must pay such [unemployment insurance] payroll taxes that may be due and owing on the remuneration made to other individuals who performed services as Flex drivers, and who were also misclassified as independent contractors rather than as employees." Amazon appealed the Commission's decision to the circuit court, which affirmed the Commission's determination. Amazon now appeals to this Court.

## II. Factual Background[1]

Diggs testified at a May 2020 Commission hearing regarding his experience as a Flex driver. Diggs explained that, after downloading the Flex application ("Flex app"), he was required to complete a multi-part tutorial comprised of five sections. Four of the sections took approximately 20 minutes to complete, and the fifth tutorial took "about 35 or 40 minutes." Among other things, the tutorials described how "[Amazon] want[ed] their packages . . . delivered or handled." Completion of the tutorials was a prerequisite to "pick[ing] up" delivery routes, which Amazon referred to as delivery "blocks." Diggs testified that the only training he received was that "tell[ing him] how to use the app." He emphasized the importance of the Flex app, explaining that it required him to be within a certain radius of the delivery location to complete the delivery and take a photo of the delivered package.

Diggs explained that once delivery blocks "drop[ped]" at 6:00 a.m. each day, he would "sit[] on [the] app, tapping [(i.e., refreshing)] . . . , waiting for blocks" to be released. Diggs noted that the design of the app necessitated constant refreshing. He testified that "there w[ere] times that you would be tapping for close to an hour, if not more." Diggs testified that delivery blocks were in "huge demand."

After selecting a delivery block, Amazon required Flex drivers to arrive at its Fulfillment Center before the block began. Once Amazon opened the lanes into the Fulfillment Center, the drivers could proceed forward to locate and load packages for delivery. Designated Amazon employees assisted in loading packages into Flex driver vehicles. Once packages were loaded, Flex drivers waited to be allowed to leave the Fulfillment Center.

---

[1] "On review, the courts must consider the evidence in the light most favorable to the finding by the Commission." *Va. Emp. Comm'n v. Peninsula Emergency Physicians, Inc.*, 4 Va. App. 621, 626 (1987).

If a driver could not complete his block by 9:00 p.m., the cutoff delivery time for all Flex drivers, Amazon required that the driver call a 1-800 number "for Amazon support," permitting Amazon to "make a notation as to why" the deliveries were not completed. Diggs explained that "[a]t the end of your block, your shift is done, so Amazon wants to be aware if you are still working, doing work for Amazon when your shift is done." Too many undelivered packages, Diggs testified, would result in a loss of the "privilege" to deliver as a Flex driver. Amazon also required Flex drivers to call a 1-800 number about damaged packages. Diggs acknowledged that Amazon occasionally sent out a report, which he characterized as a "review," that included delivery performance information.

Amazon paid Diggs weekly via direct deposit for his delivery blocks. Diggs testified that payment for delivery blocks broke down to approximately "$20 an hour," with "a three-hour block" totaling $60. Diggs used only his own vehicle while working as a Flex driver. Even so, he testified that "they'd tell us that . . . we represent Amazon while we're out there driving." Amazon required Flex drivers to wear a safety vest while driving. Amazon originally provided Diggs with a vest that "had an Amazon logo on it"; when he forgot his logoed vest, Amazon gave him a "generic vest" in which to deliver packages. Diggs wore the same Amazon-logoed vest—paired with an Amazon-logoed shirt—when he later became a Delivery Service Partner (DSP), working for a third-party company to deliver packages for Amazon.

The Flex app arranged the delivery locations into a sequence that presented the "most timely way" to complete a delivery block. The Flex app delivery sequence informed how Diggs loaded packages into his vehicle in advance of making deliveries. The Flex app also specified the delivery window during which a customer expected package delivery. Diggs agreed that the Flex app "[m]ost definitely" suggested a preferred order to deliver the packages, though he "often" used Google Maps or Waze as navigation applications to plot the fastest route between

specified delivery locations.  Although Diggs was aware some drivers made deliveries in a sequence other than that recommended by the Flex app, he heard that those experiences resulted in "horror stories."

Diggs did not perform similar delivery services for any other company while working as a Flex driver, nor did he have conversations with other drivers about whether they drove for other delivery or driving companies.  Moreover, Diggs explained that he was prohibited from working simultaneously as a Flex driver and a DSP because "a delivery partner is still considered part of Amazon, so I could not work for Amazon [as a Flex driver] and be a delivery partner."  Amazon's witness later detailed that DSPs provide "mass amounts of delivery services, i.e.[,] the . . . blueberry vans that you see driving around . . . these are those folks."  The "Independent Contractor Terms of Services" ("Agreement") governing Amazon's relationship with Flex drivers also forbade drivers from providing services "or using [their] Vehicle on behalf of any other person or entity, including competitors of Amazon," during a delivery block.  Diggs did observe Lyft and Uber stickers on vehicles lined up before the Fulfillment Center.

Amazon required Diggs to sign the Agreement when he became a Flex driver.  The Agreement required drivers to perform services "in a safe and competent manner," set out the starting and ending times for Flex deliveries, noted that Amazon would not reimburse for expenses, stated that drivers may use their own personal vehicles for deliveries, and required drivers to have a mobile device compatible with Amazon's Flex app.  The Agreement also stated that drivers would "not be able to participate" in the Flex delivery program if they "adjust[ed] the settings [of] or delete[d] the Amazon Flex app."  In addition, drivers were prohibited from both sharing their Flex app login information with others and otherwise permitting individuals access to the mobile platform.

Amazon had several prerequisites to joining the Flex program. A potential driver would have to: pass a background check; pass a potential vehicle check; be at least 21 years old; be legally eligible for employment in the relevant jurisdiction; be able "to effectively operate the Amazon Flex app and communicate with customers"; and "[i]nstall the Amazon Flex app on [their] smartphone." Pursuant to the Agreement, drivers could choose from multiple modes of transportation to deliver packages, including non-motorized transportation, a private service vehicle, a cargo van, a light truck, and public transportation. Notably, the Agreement limited the kind of personal motor vehicles drivers could use to perform their services by prohibiting the use of vehicles over certain weight thresholds and some forms of motorized transportation. The Agreement stated that Flex drivers may be required to report to Amazon their specific mode of transportation, and it prohibited the driver from deviating from their reported mode. The Agreement also prohibited a driver from "assign[ing], subcontract[ing], or delegat[ing] any . . . rights or obligations under [the] Agreement . . . without Amazon's prior written consent."

In a section titled "Service Standards," the Agreement specified that Flex drivers were to provide "timely and effective delivery of undamaged parcels, bags, totes[,] or other items to the customers' and Amazon's satisfaction." It obligated Flex drivers to meet all "Service Standards" related to safety, reliability, delivery quality, and customer service. The Agreement warned that drivers who "repeatedly arrive[d] late or forfeit[ed] Delivery Blocks late, [would] no longer be eligible to participate in the Program." It also provided that repeated customer complaints regarding the placement of delivered packages would result in a loss of "eligibil[ity]" to participate in the Flex program. The Agreement required that Flex drivers "comply with health, safety, & other applicable laws." It specified customer service expectations in subsections labeled "Rude or inappropriate behavior" and "Failure to follow instructions." Both sections cautioned that failure to abide by its respective provisions would result in a loss of eligibility to

deliver packages for Amazon. The Agreement also required that drivers "notify Amazon immediately of any accident or other on-road incident" that occurred while providing services.

The Agreement addressed privacy and user app data, including a provision stating that Amazon would store all data resulting from interactions with its "website and mobile applications." The Agreement licensed Amazon to retain Flex driver "geo-location and related tracking data, including [their] location, movements, speed at which [they] [were] traveling, and other personally identifiable information." By entering into the Agreement, drivers consented to "Amazon collecting, using[,] and sharing" the data as well as to Amazon conducting periodic background and motor vehicle record checks.

Under a section titled "Term and Deactivation," the Agreement allowed drivers to "terminate [the] Agreement at any time and for any reason," provided the driver gave a "notice of termination" by email to a specific address. It also stated that

> Amazon may terminate [the] Agreement at any time and for the following reasons by giving [a driver] a notice of termination in accordance with Section 14 below: (i) for failure to meet Service Standards, (ii) for failing a background check any time before or after the Effective Date[,] (iii) material violation of the Program Policies, (iv) material breach of this Agreement, (v) if your Amazon.com account is deactivated; or (vi) for other commercially reasonable cause.

Matthew Hallingstad, Senior Manager for AMZO Worldwide Learning, testified on behalf of Amazon. Hallingstad explained the function of Flex drivers in Amazon's operations.[2] He testified that the length of Flex driver delivery blocks depended on "capacity," i.e., "the amount of volume coming . . . through the building." Hallingstad testified that "Flex is that last

---

[2] Notably, Hallingstad acknowledged that he had "a little familiarity" with the Flex driver program based on interactions "primarily through [his prior] field experience." However, the bulk of his experience, including his position at the time of his testimony, involved managing and training in delivery operations in coordination with Amazon employees and third-party delivery service providers.

mile portion[,] . . . it's not integral to the business of Amazon[, and] . . . [i]t's something we could steer away from if we chose." He gave a "ballpark" estimate of the percentage of Amazon's deliveries made by Flex drivers as "under five percent."

Hallingstad testified that, once packages were assigned to DSPs, a routing tool would assign routes for previously unassigned packages. Flex drivers picking up these delivery blocks were allowed to cancel up to 45 minutes before a block was to start without penalty; however, beyond 45 minutes, it would be difficult for Amazon to make the deliveries, "run[ning] the risk of customer dissatisfaction by not receiving the package that they expected to receive[.]"

Moreover, Hallingstad acknowledged that the only training Flex drivers underwent related to use of the app, but not "how to make deliveries." He also contradicted Diggs's testimony about, among other things, the safety vests. Hallingstad averred that drivers were required to wear the vests only while in the Fulfillment Center, where Amazon staff provided some assistance to Flex drivers as to ensure "a safe flow of vehicles through the building at all times." Hallingstad, like Diggs, did see "a lot of Uber decals, Lyft decals . . . coming through stations," but did not testify as to whether he spoke with those drivers about their other gig-economy jobs.[3]

### III. Legal Background

#### A. *I.R.S. Revenue Ruling 87-41 and a Brief History of Code § 60.2-212(C)*

As the Commission noted in its decision, Code § 60.2-212(C) delineates the standards that the Commission applies when making determinations regarding whether an individual is an

---

[3] Here, "gig economy" refers to a labor arrangement, facilitated through digital means, where the worker provides discrete services "on-demand." *See* Sarah A. Donovan et al., Cong. Rsch. Serv., *What Does the Gig Economy Mean for Workers?* 1 (2016) ("In the basic model, gig workers enter into formal agreements with on-demand companies to provide services to the company's clients. Prospective clients request services through an Internet-based technological platform or smartphone application that allows them to search for providers or to specify jobs.").

employee for unemployment tax purposes. Before July 1, 2020, subsection C, in pertinent part, provided,

> Services performed by an individual for remuneration shall be deemed to be employment subject to this title unless the Commission determines that such individual is not an employee for purposes of the Federal Insurance Contributions Act and the Federal Unemployment Tax Act, based upon an application of the 20 factors set forth in Internal Revenue Service Revenue Ruling 87-41, issued pursuant to 26 C.F.R. 31.3306(i)-1 and 26 C.F.R. 31.3121(d)-1.

This version of Code § 60.2-212(C), which dates to 2005, tasks the Commission with using the I.R.S.'s 20 factors to determine whether a putative employer must make unemployment tax contributions. The 20 factors set out in I.R.S. Revenue Ruling 87-41 were designed to help guide determinations as to "whether an individual is an employee." Rev. Rul. 87-41, 1987-1 C.B. 296, *4 (1987). Taken together, the factors tease out whether a putative employer "exercise[s] sufficient control over the individual for the individual to be classified as an employee." *Id.* "Control" is *the* core consideration in the 20-factor inquiry.[4] The 20 factors serve as "an aid to determining whether an individual is an employee under the common law rules." *Id.* They provide that an employer-employee relationship generally exists "when the person . . . for whom the services are performed ha[s] the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work

---

[4] This emphasis on control is also apparent in the evaluative tool that the I.R.S. recently developed to augment the 20 factors. This tool organizes many of the 20 factors into a new architecture, and sorts "facts that provide evidence of the degree of control and independence . . . into three categories": "behavioral," "financial," and "type of relationship." In so doing, the tool addresses the following considerations, which reflect 15 of the original 20 factors: type of instructions given; when and where; tools or equipment; hire assistants; work to be performed personally; sequence; evaluation systems; training; significant investment; unreimbursed expenses; opportunity for profit or loss; services available to the market; permanency of relationship; and services provided as key activity of the business. I.R.S., Independent Contractor (Self-Employed) or Employee?, https://www.irs.gov/businesses/small-businesses-self-employed/independent-contractor-self-employed-or-employee (last visited Sept. 19, 2023).

but also as to the details and means by which that result is accomplished." *Id*. *See also* 26 C.F.R. § 31.3121(d)-1(c)(2). That is, the 20 factors list types of evidence relevant to the application of the common law rules, and, in turn, assessing control.

The 20 factors are: (1) instructions; (2) training; (3) integration; (4) services rendered personally; (5) hiring, supervising, and paying assistants; (6) continuing relationship; (7) set hours of work; (8) full time required; (9) doing work on employer's premises; (10) order or sequence set; (11) oral or written reports; (12) payment by hour, week, month; (13) payment of business and/or traveling expenses; (14) furnishing of tools and materials; (15) significant investment; (16) realization of profit or loss; (17) working for more than one firm at a time; (18) making service available to general public; (19) right to discharge; and (20) right to terminate. Rev. Rul. 87-41 at *4-7.

But Code § 60.2-212(C) did not always require use of the 20 factors. Prior to 2005, Code § 60.2-212(C) provided,

> Services performed by an individual for remuneration shall be deemed to be employment subject to this title unless:
>
> 1. Such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact; and
>
> 2. Such service is either outside the usual course of the business for which such service is performed, or such service is performed outside of all the places of business of the enterprise for which such service is performed; or such individual, in the performance of such service, is engaged in an independently established trade, occupation, profession or business.

*See Va. Emp. Comm'n v. Thomas Reg'l Directory, Inc.*, 13 Va. App. 610, 612-13 (1992) (quoting Code § 60.2-212(C)). Hence, the 2005 codification of the 20 factors marked a turn away from the "ABC test," under which,

> the hiring entity must establish that: (A) the worker is free from the control and direction of the hirer in connection with the

- 10 -

performance of the work . . . ; (B) the worker performs work that is outside the usual course of the hiring entity's business; and (C) the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed for the hiring entity.

Betty J. Williams et al., *Worker Classification Best Practices and Remedies for Error: Options for Professional Practices*, 33 Prac. Tax L. 23, 28 (2018). Among many things, what distinguishes the ABC test from the 20 factors is the extent of the measurement of control. While the question of control, in an ABC analysis, is one of three, coequal considerations, in a 20-factor analysis, it is the sole inquiry.

B. *The burden is on a putative employer to establish that the Code § 60.2-212(C) exemption applies.*

It is not possible to adjudicate Amazon's assignments of error without, first, elaborating the analytical principles—related to Amazon's evidentiary burden, controlling standards of review, and so on—that will guide and undergird the analysis to follow. Amazon does not engage with these principles and, thus, on brief, advances arguments and patterns of analysis unbound by them. This Court, however, must conform to established principles of appellate review.

Historically, the law has imposed on putative employers the burden to show that an individual is *not* an employee for unemployment tax purposes. As we have not formally addressed the putative employer's evidentiary burden under Code § 60.2-212(C), as amended in 2005, we do so now.[5]

Before 2005, Code § 60.2-212(C) provided, "Services performed by an individual for remuneration shall be deemed to be employment subject to this title unless" the prongs of the

---

[5] However, the issue was touched on in an unpublished opinion of this Court. *See Career Dev. Ctr., Inc. v. Va. Emp. Comm'n*, No. 0420-21-2, slip op. at 7, 2021 WL 5893552, at *4 (Va. Ct. App. Dec. 14, 2021).

- 11 -

ABC test were met.  Our Supreme Court, in 1941, interpreted this language, noting, "[t]he burden is upon the appellant to show that the service rendered it by them for remuneration does not constitute 'employment' under the act." *Life & Cas. Ins. Co. of Tenn. v. Unemployment Compensation Comm'n of Va.*, 178 Va. 46, 54 (1941).  Building on its holding in *Life*, the Supreme Court later construed the same statutory language to mean that "the burden is on the putative employer to establish by a preponderance of the evidence that it is within the statutory exemptions." *Va. Emp. Comm'n v. A.I.M. Corp.*, 225 Va. 338, 346 (1983).

The new version of Code § 60.2-212(C) introduced in 2005, likewise, provided, "Services performed by an individual for remuneration *shall be deemed to be employment* subject to this title *unless* the Commission determines that such individual is not an employee for purposes of the Federal Insurance Contributions Act and the Federal Unemployment Tax Act[.]" (Emphasis added).  Because the statute did not change the language "Services performed by an individual for remuneration shall be deemed to be employment subject to this title unless," it preserved the employer's evidentiary burden.  Thus, once the Commission proves that services are performed for remuneration, *Va. Emp. Comm'n v. Porter-Blaine Corp.*, 27 Va. App. 153, 162 (1998), the burden shifts to the putative employer to prove, by a preponderance of the evidence, that the subject individual is not an employee, *A.I.M. Corp.*, 225 Va. at 346.

In sum, the current version of Code § 60.2-212(C) continues to require that the putative employer bear the burden of defeating the presumption of an employer-employee relationship.

C. *The 20 factors are only guides, intended to draw attention to the substantive dynamics operative in a specific service arrangement.*

The 20 factors are not rigid criteria.  There is no threshold number of factors that must be satisfied before a putative employer is found to exert a level of control over an individual sufficient to find an employer-employee relationship.  To the contrary, Revenue Ruling 87-41 explains that the "twenty factors are designed only as guides for determining whether an

individual is an employee" and notes that "special scrutiny is required in applying the twenty factors to assure that formalistic aspects of an arrangement designed to achieve a particular status do not obscure the substance of the arrangement." Rev. Rul. 87-41 at *4. Hence, the Ruling offers no concrete standards, beyond descriptions of each of the 20 factors, for courts and other bodies to use in their application. Indeed, such standards would be antithetical to the Ruling's own observation that a 20-factor inquiry is fact-sensitive, attentive to the subtle dynamics of control at work within *specific* service arrangements. Accordingly, Revenue Ruling 87-41 also does not provide guidance on how any one factor should be weighed in relation to others. *See id.* ("The degree of importance of each factor varies depending on the occupation and the factual context in which the services are performed."). Instead, it is consideration of the full service arrangement, in all salient dimensions, that determines whether an individual is an employee or an independent contractor.[6]

IV. Standard of Review

On appeal, "the Commission's findings of facts, if supported by the evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of the court shall be confined to questions of law." Code § 60.2-500(C). In other words, the Commission's proper factual findings are not subject to appellate review. *See Stonega Coke & Coal Co. v. Sutherland*, 136 Va. 489, 491 (1923). Therefore, we view the evidence "in the light most favorable to the findings of the [C]ommission, and we will not disturb the [C]ommission's findings unless the evidence, as a matter of law, is insufficient to support those findings." *Brothers Constr. Co. v.*

---

[6] Although the 20 factors are commonly referred to as a *test*, this language is notably absent from Revenue Ruling 87-41. The Ruling eschews the idea that the factors should be applied in a rigid, formulaic fashion, suggesting that the factors do not form a test, but rather constitute a framework to be used in the analysis of the specific facts of any one service arrangement.

- 13 -

*Va. Emp. Comm'n*, 26 Va. App. 286, 293 (1998) (quoting *Va. Emp. Comm'n v. Peninsula Emergency Physicians, Inc.*, 4 Va. App. 621, 626 (1987)).

"A decision by the [Commission] that conjoins both factual and legal issues presents a 'mixed question' on review." *Smith v. Va. Emp. Comm'n*, 59 Va. App. 516, 520 (2012) (quoting *Snyder v. Va. Emp. Comm'n*, 23 Va. App. 484, 491 (1996)). "In such cases, we segregate (*to the extent we can*) the law from the facts—review the law *de novo* and the facts with the deference required by Code § 60.2-[500(C)]." *Id.* (emphasis added). "We do so . . . mindful of the overarching premise that 'a reviewing court cannot substitute its own judgment for the agency's on matters committed by statute to the agency's decision.'" *Id.* (quoting *Va. Emp. Comm'n v. Trent*, 55 Va. App. 560, 568 (2010)).

Virginia has not previously grappled with whether the Commission's factor determinations under a 20-factor analysis are factual findings, and thus, subject to review under the heightened standard set out in Code § 60.2-500(C). "What constitutes an employee is a question of law; but, whether the facts bring a person within the law's designation, is usually a question of fact." *Intermodal Servs., Inc. v. Smith*, 234 Va. 596, 600 (1988) (quoting *Baker v. Nussman*, 152 Va. 293, 298 (1929)) (considering the meaning of "employee" under the Workers' Compensation Act). The Commission, in deciding whether individual factors are indicative of an employer-employee or independent contractor arrangement, is determining whether the facts are such as to bring a person within the ambit of the "law's designation." Accordingly, such determinations are findings of fact, to which this Court owes the requisite level of deference. *Cf. Brothers Constr. Co.*, 26 Va. App. at 296 (holding that the Commission's findings regarding the control factor in the ABC test, because supported by the evidence, did not err as a matter of law, and were thus "dispositive").

- 14 -

But this Court is not bound by the Commission's interpretation of the 20 factors. Interpretation of the factors presents a question of law that we review de novo. "In our review of the law, we are guided by the following principles: 'The meaning of "employment" in the unemployment compensation context is controlled by statute. . . . The Act is to be liberally construed to effect its beneficent purpose and in borderline cases "employment" should be found to exist.'" *Id.* at 293 (quoting *A.I.M. Corp.*, 225 Va. at 345-46). "Exemptions in the Act should be strictly construed against the alleged employer, the rule requiring liberal construction in favor of the taxpayer not being applicable." *Id.* (quoting *A.I.M. Corp.*, 225 Va. at 346).

## V. Analysis

### A. *The circuit court did not err in affirming the Commission's determination.*

On appeal, Amazon argues that the Commission's findings were unsupported by the evidence and the law. We disagree. The evidence supports the Commission's determination that Diggs was an Amazon employee. What is more, the Commission's findings, including its individual control factor determinations, are conclusive and binding on this Court. Thus, we are not entitled to disturb them. Accordingly, we hold that the circuit court did not err in affirming the decision of the Commission.

### 1. The Commission's Factor Determinations

In applying the individual factors to the facts of this case, the Commission found most suggest an employer-employee relationship. Specifically, the Commission found that, when evaluated against the evidence in the record, factors 2 (training), 3 (integration), 4 (services rendered personally), 5 (hiring, supervising, and paying assistants), 11 (oral or written reports), 12 (payment by hour, week, month), 14 (furnishing of tools and materials), 17 (working for more than one firm at a time), and 18 (making service available to the general public) all tilted toward

- 15 -

an employer-employee relationship.[7]  The Commission also found that while some factors, including factor 16 (realization of profit or loss), carried less weight, factor 13 (payment of business and/or traveling expenses) was indicative of an independent contractor relationship.[8]  These factor determinations were supported by the evidence.

In addition to the aforementioned factors are a subset of factors that warrant further discussion and more granular scrutiny, whether due to the strenuousness of Amazon's arguments or the need to clarify the Commission's determinations in response to Amazon's forceful objections.  These factors include 1, 6, 7, 8, 9, 10, 15, 19, and 20.

---

[7] The Commission made no explicit determination as to whether factors 2, 3, and 17 were indicative of an employer-employee relationship.  However, its findings show a level of control consistent with an employer-employee relationship sufficient to support the Commission's finding of an employment relationship.  The Commission found the tutorials to be mandatory training under factor 2, Rev. Rul. 87-41 at *4 (compulsory training "indicates that" a putative employer "want[s] the services performed in a particular method or manner"); the services performed by Flex drivers "essential" to and integrated into the Amazon business model under factor 3, *id*. at *5 ("Integration of the worker's services into the business operations generally shows that the work is subject to . . . control."); the Agreement provision that prohibited drivers from "perform[ing] services for competitors during blocks," limited entrepreneurship by preventing drivers from "simultaneously provid[ing] services for several, unrelated companies or multiple companies" under factor 17, *id*. at *7 ("If a worker performs more than de minimis services for a multiple of unrelated . . . firms at the same time, that factor generally indicates that the worker is an independent contractor.").

Regarding factor 4, the Commission found that the evidence demonstrated "the personal nature of the [Flex drivers'] services."  As such, the Commission found that this factor was suggestive of an employer-employee relationship, notwithstanding the absence of an explicit statement to this effect.

[8] Although the Commission did not make a definite determination as to this factor, it found that Amazon required that drivers "bear the cost of Amazon's expenses in the event of mishaps on the route resulting to injury or property damage of third parties" and noted that Amazon "successfully establishe[d] that the Flex driver bears the cost of all expenses to operate, maintain, and protect the delivery vehicle during the performance of duties."  Diggs's testimony also confirmed that he drove his own vehicle to make the deliveries and that he received "no reimbursement for any expenses whatsoever."  As such, we read the Commission's findings to indicate that, for the purposes of this factor, Amazon's relationship with Flex drivers was more reflective of an independent contractor arrangement, a conclusion the record readily supports.

- 16 -

### a. Factor 1: Instructions

> A worker who is required to comply with other persons' instructions about when, where, and how he or she is to work is ordinarily an employee. This control factor is present if the person or persons for whom the services are performed have the RIGHT to require compliance with instructions.[9]

Rev. Rul. 87-41 at *4.

Amazon's various arguments can be summed to the claim that it does not issue instructions for when, where, or how Flex drivers work and that it maintains "no right to require [Flex drivers] to comply with such instructions." The Commission concluded that "Amazon required Flex drivers to comply with specific instructions on when, where and how Delivery blocks were to be completed and, by its Independent Contractor Terms of Service agreement, set out policy governing Flex driver[s'] conduct in the performance of their duties." We find that the Commission's conclusion flows directly from its factual findings and the record.

The Commission found that drivers signed up for "blocks" with "assigned . . . start time[s]"; were required to arrive at the Amazon facility 30 minutes before a delivery block and "were not allowed to leave for their route until released by Amazon"; "had until 9:00 p.m. . . . to deliver all packages or return undelivered or undeliverable packages to the Fulfillment Center"; were provided a route for the delivery of packages; and "had no power to negotiate a particular route or trade with other Flex drivers to complete [delivery] blocks." Further, the Commission found that the Flex app dictated where Flex drivers placed packages, that drivers were to contact Amazon about problems, that Diggs "credibly testified" that "he was required to call and alert Amazon" "when he was running behind the schedule," and that Flex drivers were required to note delays, allowing Amazon to update customers.

---

[9] As noted, *supra*, substantive descriptions accompany each of the factors enumerated in Revenue Ruling 87-41. This, like all subsequent factor statements, found *infra*, is the language the Ruling itself uses to explain the factor.

The Commission also examined the Agreement governing Amazon's relationship with Flex drivers, characterizing it as "a policy manual for governing Flex driver conduct." The Commission noted that the Agreement required drivers to "behave respectfully and professionally in interacting with customers and others" and that it "instructed [drivers] to restrict access to secure Internet sites, report late deliveries, and practice civility when dealing with customers." The Commission found that these requirements extended beyond general instructions about "making timely deliveries" and "following the rules of the road," but instead constitute "evidence of control about when, where, and how the Flex driver is to perform his duties."

All the Commission's findings on this factor are supported by the record. Diggs testified that he signed up for delivery blocks within a specific timeframe, that he was required to arrive at the Fulfillment Center in advance of deliveries to collect packages, in precisely the manner described by the Commission, that a 9:00 p.m. ceiling existed with respect to when packages could be delivered, that it would be impracticable for drivers to deliver packages in a manner *other* than the sequence recommended by Amazon's app, that he could only deliver a package if within the geographical radius prescribed by Amazon's app, and that he had to alert Amazon to issues. The delivery-block sign-up process Diggs outlined also made clear that it was not possible to negotiate for blocks or exchange blocks with other drivers. Moreover, Diggs testified that Amazon periodically sent emails to the drivers reporting their performance.

The Agreement provided that drivers were required to adhere to all relevant health, safety, and other laws; "[a]rriv[e] on time or timely forfeit[] Delivery Blocks"; "deliver the packages to the customers on time [and] . . . [within] the delivery window during which the customer expects the package to be delivered"; timely "return [to Amazon, unless otherwise directed,] all packages" "picked up as part of [a] Delivery Block" that were not delivered or

- 18 -

undeliverable; "behave respectfully and professionally"; and "follow instructions," to wit, "delivery instructions in the app or from a customer." The Agreement also provided that drivers who "disregard the [customer and delivery] instructions" would "no longer be eligible to participate in the Program."

Contrary to Amazon's contentions, the Commission's determination that "Amazon required Flex drivers to comply with specific instructions on when, where and how Delivery blocks were to be completed" is supported by the record. That the text of the Agreement purports to give Flex drivers control over the "means and manner" for providing services does not negate the Commission's determination. Accordingly, Amazon's arguments regarding this control factor fail.

### b. Factor 6: Continuing Relationship

> A continuing relationship between the worker and the person or persons for whom the services are performed indicates that an employer-employee relationship exists. A continuing relationship may exist where work is performed at frequently recurring although irregular intervals.

Rev. Rul. 87-41 at *5.

Amazon claims that it "does not retain [Flex drivers] on a regular or continuing basis." It further argues that, unlike employees, "independent contractors' work ends with the job," and that there "is no continuing relationship between [delivery] blocks." Amazon argues that the absence of such a relationship between blocks is "dispositive of this factor," and claims that it does not matter "how frequently, or over what period of time [Flex drivers] sign up for additional delivery blocks."

The record shows that Diggs worked as a Flex driver for 10 months, slightly more than the 30-week average of most Flex drivers. Significantly, Diggs worked solely as a Flex driver for the ten months that he actively performed services, in an arrangement which, the Commission

- 19 -

found, was more "akin to the temporary employee, hired to meet a specific business need." The Commission found that this evidence is "highly suggestive" of an employer-employee relationship.

The Commission made no mistake in its application of this control factor. Under factor 6, "A continuing relationship . . . where work is performed at frequently recurring although irregular intervals" may show that an employer-employee relationship exists. Here, the evidence undisputedly showed that Diggs served as a Flex driver in regular intervals over a ten-month period, just a few months more than the average. What is more, during those ten months, Diggs worked only as a Flex driver. These facts provide sufficient support for the Commission's factor 6 determination.

### c. Factor 7: Set Hours of Work

The establishment of set hours of work by the person or persons for whom the services are performed is a factor indicating control.

Rev. Rul. 87-41 at *5.

On control factor 7, Amazon contends that it "does not set any schedule for [Flex drivers]" and emphasizes the flexibility Flex drivers had to set their own schedules. However, Amazon also admits that drivers cannot "start the job at random times." Although the Commission found Amazon's arrangement with its Flex drivers less flexible than Amazon contended, it found factor 7 a less important indicator of an employer-employee relationship, due to the challenges drivers faced in terms of working set hours.

The Commission found that drivers' hours were constrained by the "availability" of delivery blocks and that Amazon, not drivers, determined and set the length of a delivery block. The Commission concluded that, although "Flex drivers do [in essence] have set hours of work," "[g]iven the difficulty in obtaining blocks . . . and the other constraints Flex drivers face in getting and managing multiple blocks, this factor is of less importance than some of the other

control factors," effectively due to the difficulties and constraints hampering the ability of Flex drivers to claim delivery blocks. We hold that the Commission did not err in this factual determination.

### d. Factor 8: Full Time Required

> If the worker must devote substantially full time to the business of the person or persons for whom the services are performed, such person or persons have control over the amount of time the worker spends working and impliedly restrict the worker from doing other gainful work. An independent contractor on the other hand, is free to work when and for whom he or she chooses.

Rev. Rul. 87-41 at *5.

The Commission found that "[t]he evidence is undisputed that Amazon never required any of its Flex drivers to work full time." However, the Commission further found that given the "fierce" competition for delivery blocks, drivers could not have worked full time. The Commission also found this factor less important than others, stating, "Like a temporary employer, [Amazon] doled out daily assignments to drivers as needed." As such, the Commission concluded that "this factor is [not] as important as some of the other factors."

Flex drivers did not work full time, and Amazon argues that the Commission improperly discounted the significance of factor 8 in its analysis. We disagree. It is true that Flex drivers were not full-time workers, and so did not "devote substantially full time to the business." Rev. Rul. 87-41 at *5. Yet, it is also true that Flex drivers were unlike independent contractors who "work *when* and for whom [they] choose[]." *Id*. (emphasis added). The Commission's factual findings indicated that Flex drivers had little control over when they worked. Instead, as the Commission found, the arrangement between Amazon and Flex drivers bore the indicia of a temporary employer-employee relationship, with the employer "dol[ing] out daily assignments . . . as needed."

e. Factor 9: Doing Work on Employer's Premises

> If the work is performed on the premises of the person or persons for whom the services are performed, that factor suggests control over the worker, especially if the work could be done elsewhere. Work done off the premises of the person or persons receiving the services, such as at the office of the worker, indicates some freedom from control. However, this fact by itself does not mean that the worker is not an employee. The importance of this factor depends on the nature of the service involved and the extent to which an employer generally would require that employees perform such services on the employer's premises. Control over the place of work is indicated when the person or persons for whom the services are performed have the right to compel the worker to travel a designated route, to canvass a territory within a certain time, or to work at specific places as required.

Rev. Rul. 87-41 at *5.

For factor 9, Amazon specifically takes issue with the Commission's conclusion that "Amazon's 'work premises' . . . were expanded to include the locations for deliveries." Amazon claims that the work performed by Flex drivers involved the transportation of packages *between* its facilities and customers' homes and argues that the Commission's reliance on *Brothers Construction*, 26 Va. App. at 297, was misplaced, as "[d]elivery addresses are not job sites" and "[c]ustomers' homes are not where the work is performed; they are where the delivery services—which are performed on the road—end."

The focus of factor 9 concerns, by its own terms, "the nature of the service involved and the extent to which an employer generally would require that employees perform such services on the employer's premises." Rev. Rul. 87-41 at *5. Essentially, the factor looks at "[c]ontrol over the place of work." *Id.* Factor 9 considers how a putative employer may control the geography of work by dictating, among other things, where and at what time that work is performed. *Id.* The Commission found that the nature of the Flex driver position, in large part, entailed the performance of services in locations other than Amazon's Fulfillment Center, finding that "the routes were where the drivers performed the bulk of their duties." Further, the

Commission noted Amazon's expectation of Flex drivers "to deliver packages to Amazon customers at locations specified by Amazon, and on occasion, in accordance with Amazon customers' delivery instructions." Consequently, the Commission found that, under factor 9, "Amazon's 'work premises'" encompassed "the locations for deliveries that were specified by Amazon and its customers."[10]

Factor 9 contemplates that certain work may not be confined to an employer's physical premises. Hence, the relevant considerations are the nature of the service and the extent to which an employer would require such services to be performed on its premises. The nature of the work performed by Flex drivers—and by all Amazon delivery partners—required performance somewhere other than on Amazon premises though, as discussed *supra*, the Agreement obligated Flex drivers to some contact with Amazon Fulfillment Centers. Therefore, the importance of this factor is necessarily limited.

Even so, the record is sufficient to support a factor determination that Amazon controlled the place of work of Flex drivers consistent with an employer-employee relationship. "Control over the place of work is indicated when the person or persons for whom the services are performed have the right to compel the worker to travel a designated route, [or] to canvass a territory within a certain time . . . ." Rev. Rul. 87-41 at *5. Amazon designated a route that Flex drivers used to travel between specific locations and compelled Flex drivers to complete a

---

[10] Amazon urged the Commission to adopt the position of the Supreme Court of New Jersey that "residences of . . . customers are clearly 'outside of all the places of business.'" *Carpet Remnant Warehouse, Inc. v. N.J. Dept. of Lab.*, 593 A.2d 1177, 1190 (N.J. 1991) (citation omitted). The Commission declined to do so, noting that "[i]n Virginia . . . [a] broader view has been adopted." In *Brothers Construction* this Court held that "'places of business' are not confined to the headquarters or office premises of the employer but embrace all of the sites in the territory in which the alleged employees worked." 26 Va. App. at 297. Although instructive, *Brothers Construction* is not the linchpin holding together the Commission's factor determination. It, like *Carpet Remnant Warehouse*, applied the ABC test of employer-employee relationship. We, as did the Commission, look to the express language of factor 9 as controlling.

predetermined delivery block's territory within a certain time. Because there are other aspects of the Flex driver arrangement which indicate control over the place of work, we need not determine whether a customer's home constitutes a "site[] in the territory in which" a Flex driver operated.[11] *See Brothers Constr. Co.*, 26 Va. App. at 297.

### f. Factor 10: Order of Sequence Set

If a worker must perform services in the order or sequence set by the person or persons for whom the services are performed, that factor shows that the worker is not free to follow the worker's own pattern of work but must follow the established routines and schedules of the person or persons for whom the services are performed. Often, because of the nature of an occupation, the person or persons for whom the services are performed do not set the order of the services or set the order infrequently. It is sufficient to show control, however, if such person or persons retain the right to do so.

Rev. Rul. 87-41 at *6.

Factor 10 queries the extent to which a putative employer requires a particular order of performance. Amazon flatly rejects the Commission's characterization of the "sequence set" through which drivers must pass as they perform their duties. It argues that "[w]hat matters is whether Amazon requires [Flex drivers] to *perform delivery services* in a particular sequence or order," and not whether it requires of an individual various steps to provide delivery services. Essentially, Amazon asks us to narrow the focus of this factor.

---

[11] Similarly, there is no need for this Court to reach the merits of the Commission's findings that the provisions of the Agreement showed that "Amazon maintained insurance coverage for Flex drivers and retained a lease granting exclusive possession and control of the Flex driver's vehicle while delivering a block," thereby providing evidence of "a nexus between the route, the customers' locations, and its principal place of business." As we do elsewhere, we affirm the Commission's determination on the best and narrowest grounds. *See Smith*, 59 Va. App. at 521 n.1 ("As an appellate court, we seek 'the best and narrowest ground available' for our decision, and thus strive to resolve cases 'on what we conceive to be the determinative points.'" (citations omitted) (quoting *Morris v. City of Va. Beach*, 58 Va. App. 173, 180 (2011))).

The Commission found that Amazon required drivers to perform services in a sequence.

> Specifically, drivers were required to 1. Log on the App;
> 2. Request a block; 3. Receive confirmation of receipt of the block;
> 4. Go to the warehouse; 5. Wait for it to open; 6. Scan and Load
> the numbered packages; 7. Wait to be released to start deliveries;
> 8. Scan and deposit the packages at the door according to the order
> dictated by the App; 9. Take a photo . . . ; and [10.] Return any
> undeliverables.

This sequence identified by the Commission includes specific tasks, set in a specific order, that drivers had to undertake in the performance of their services. The "performance" encompassed not only the physical act of delivering packages, but also those concrete service-related tasks Flex drivers completed to be able to execute the core function of delivering packages.

Yet, even if these basic tasks were insufficient to show Amazon's control over how Flex drivers rendered services, the Commission's finding that the app recommended to drivers a sequence for delivering packages is sufficient to show such control. While observing that "[d]rivers could disregard the App, delivering package #22 before #20," the Commission noted that "[Diggs] testified there was no reason for them to do so," since the "App provided the route most likely to result in the driver finishing within the time allotted for the block." The Commission's decision acknowledged that although "the route . . . [wa]s not enforced by [Amazon]," Amazon also had "the ability to deactivate the driver's access to the App for too many late deliveries." This evidence was sufficient to show that Amazon retained the right to control a driver's performance. Diggs specifically testified that, although drivers could deliver packages out of sequence, in practice, "[i]t's just not easy to go out of order" and he had "heard the horror stories" of drivers who had attempted to do so.

Factor 10 contemplates the compulsion—express or implicit—of a worker's performance in a specified order. Although Flex drivers may have, in the abstract, ignored the delivery sequence recommended by the Flex app, the Commission made its determination that the factor

is suggestive of an employment relationship based, in part, on how this component of the parties' arrangement operated in practice. The Commission was not wrong to do so.

### g. Factor 15: Significant Investment

> If the worker invests in facilities that are used by the worker in performing services and are not typically maintained by employees (such as the maintenance of an office rented at fair value from an unrelated party), that factor tends to indicate that the worker is an independent contractor. On the other hand, lack of investment in facilities indicates dependence on the person or persons for whom the services are performed for such facilities and, accordingly, the existence of an employer-employee relationship.

Rev. Rul. 87-41 at *6.

Factor 15 considers whether a worker has personally invested in facilities that assist in performance of services, or whether workers rely, to the extent necessary for performance, on provision of the putative employer. The Commission framed the inquiry as one concerning whether a worker showed a "vested interest in an ongoing business." This was not the proper consideration. The terms "facilities" and "business" are not synonymous. *Compare Facility*, *Cambridge Dictionary*, https://dictionary.cambridge.org/us/dictionary/english/facility (last visited Sept. 19, 2023) (defining "facility" to mean, in pertinent part, "something such as a place, building, or equipment used for a particular purpose or activity"), *with Business*, *Cambridge Dictionary*, https://dictionary.cambridge.org/us/dictionary/english/business (last visited Sept. 19, 2023) (defining "business" as, in pertinent part, "the activity of buying and selling goods and services").

Thus, the Commission's interpretation of factor 15 missed the mark.[12] The relevant question is whether a worker has invested in "facilities"—the essential implements, whether a

---

[12] Much of the Commission's analysis regarding this factor, rather than evaluating Flex drivers' investments in facilities, shades into an ABC analysis, asking directly if a worker is engaged in an independently established business. The Commission noted an absence of

- 26 -

building or equipment—needed by a worker to perform the services.  Factor 15 notes an "office" as an example of a facility.

Notwithstanding its misinterpretation, the Commission properly found that Flex drivers invested in facilities.  The record supports the Commission's finding that "driver[s] [had a] responsibility for the maintenance and upkeep of the vehicle."  The vehicles driven by Flex drivers constitute a facility, enabling drivers to perform the service provided to Amazon.  That drivers bore sole responsibility for the maintenance of this facility is indicative of an independent contractor relationship.  Yet, the Commission also found that "apart from the vehicle, the driver has no vested interest in the Fulfillment Center, the packages to be delivered, or the customers who ordered the packages."  The Commission's finding that drivers did not "invest" in essential Fulfillment-Center-based facilities is suggestive of an employer-employee relationship.

Neither clearly indicative of an employer-employee nor an independent contractor arrangement, the Commission's findings are indeterminate.  Accordingly, the Commission's conclusion that this factor carries little weight in determining the Flex driver's classification is not unsupported by the record.  *See* Code § 60.2-500(C) ("[T]he Commission's findings of facts, if supported by the evidence and in the absence of fraud, shall be conclusive[.]").

h.  Factor 19: Right to Discharge

> The right to discharge a worker is a factor indicating that the worker is an employee and the person possessing the right is an employer.  An employer exercises control through the threat of dismissal, which causes the worker to obey the employer's instructions.  An independent contractor, on the other hand, cannot

---

"competent or reliable evidence that [Diggs] or any of Amazon's Flex fleet have invested in independently established businesses."  Whether an individual has invested in advertising or drives for another company is not relevant to a factor-15 inquiry as it might be in an ABC analysis.  And although the Commission properly concluded that whether a Flex driver drove for similar app-based companies "carries little weight in determining the Flex driver's classification" under factor 15, it also concluded that "a worker's ownership or control of a vehicle does not factor significantly in the analysis of whether or not he has a vested interest in an ongoing business."

> be fired so long as the independent contractor produces a result that meets the contract specifications.

Rev. Rul. 87-41 at *7.

Amazon contends that the Commission "misread[] the Agreement as creating an at-will employment relationship," arguing that although the Commission "correctly found that Amazon's ability to terminate the relationship is governed by the Agreement," it nonetheless erroneously "concluded that the contractual limitations" were "suggestive" of an employment relationship.

The Commission found deactivating the app to be tantamount to unilateral severance of the service relationship and that the Agreement lists numerous circumstances where Amazon may deactivate a Flex driver's access to the app. This includes instances where a driver "adjust[s] . . . or delete[s] the Amazon Flex app"; fails to serve in a "safe and competent manner in accordance with the [requisite] level of professional care" or comport with applicable "laws, rules, . . . regulations," "Service Standards," or "Program Policies"; fails a background check; deactivates their Amazon.com account; uses a vehicle other than the one reported to Amazon; "repeatedly arrive[s] late or forfeit[s] Delivery Blocks late," delivers packages outside of the customer-specified delivery window, delivers packages to a location which customers cannot find, fails to return "undeliverable packages to a location specified by Amazon," engages in "[r]ude or inappropriate behavior," or "[f]ail[s] to follow instructions"; and so on. The Agreement also allowed Amazon to terminate the relationship "for other commercially reasonable cause," without specifying what those causes are or might be. The Commission found that these facts suggested an employer-employee relationship.

The Commission did not misapply this factor. Indeed, factor 19 provides that an independent contractor may be discharged only for producing a result that fails to "meet[] the contract specifications." Rev. Rul. 87-41 at *7. Here, Amazon retained its ability to deactivate a

- 28 -

driver's access to the Flex app for a variety of reasons, some nebulously defined, others unrelated to the strict fulfillment of "contract specifications." *Id.* In other words, the panoply of circumstances the Commission referenced gave Amazon wide latitude in deactivating Flex drivers' app access, and in so doing, effectively discharging them. Accordingly, the Commission's conclusion that Amazon retained a "right to discharge" Flex drivers consistent with an employer is supported.

> i. Factor 20: Right to Terminate
>
> If the worker has the right to end his or her relationship with the person for whom the services are performed at any time he or she wishes without incurring liability, that factor indicates an employer-employee relationship.

Rev. Rul. 87-41 at *7.

Amazon argues that, unlike employees, who may leave an employment arrangement without incurring liability, "Partners [who] quit without fulfilling their contractual duties . . . may be liable to defend and indemnify Amazon against any liabilities it incurs as a result."

The point is well taken. However, the Commission focused on the evidence presented to show that Flex drivers could "cancel or refuse to accept any block without recourse."[13] Based on *this* fact, the Commission could find, pursuant to factor 20, that Flex drivers could end their relationship with Amazon at any time without incurring liability. *See* Rev. Rul. 87-41 at *7. Consequently, the Commission's determination that the arrangement was suggestive of an employment relationship was supported by evidence.

---

[13] In its analysis of factor 7, the Commission observed that a Flex driver could "choose as many . . . or as few blocks as they desire, and they may cancel blocks (if 45 minutes prior to the scheduled start time) without penalty."

- 29 -

## 2. Conclusion of 20-factor inquiry

After considering all the factors, the Commission found that "[a] majority of the factors" demonstrated that Amazon "has the right to exercise a substantial degree of control over [Diggs] and its other Flex drivers who deliver packages on behalf of Amazon to its customers." The Commission thus concluded that Diggs should have been classified as an employee. This determination, based on the cumulative result of applying the 20 factors to the facts of this case and making discrete determinations as to each factor, was supported by evidence in the record. Specifically, the Commission found that, in total, 15 factors tended to show an employer-employee relationship and one factor supported independent contractor status. The Commission also found four factors less significant to its analysis. Because the Commission's factor determinations were supported by the record, and Amazon makes no claim that fraud affected the Commission's decision, the Commission's further determination as to Diggs's employment status is binding.

B. *The circuit court did not err in affirming the Commission's determination that Amazon is required to pay unemployment insurance taxes for all Flex drivers.*

The Commission also found that Amazon must pay unemployment insurance taxes for all Flex drivers. It noted that "the terms and conditions of the Agreement apply equally to all Flex drivers." And "[w]here there is an employment relationship demonstrated with one, then there would be with all who are subject to the same terms and conditions." Thus, Amazon was required to "pay such [unemployment insurance] payroll taxes that may be due and owing on the remuneration made to other individuals who performed services as Flex drivers, and who were also misclassified as independent contractors rather than employees." The circuit court affirmed the Commission's finding.

Amazon contends that the Commission mistakenly generalized Diggs's experience to all Flex drivers, and, among other things, that the Commission erroneously relied on the terms of the

Agreement to determine that all similar Flex drivers were, like Diggs, in an employment relationship.[14]  Amazon claims that the "20-factor test" precludes courts from looking to "the terms of any agreement between the worker and the putative employer."  Although it refers generally to Revenue Ruling 87-41 in support of this proposition, Amazon's claim cannot square with the Ruling, which explains that, under a 20-factor inquiry, "it is not necessary that the employer *actually* direct or control the manner in which the services are performed; it is sufficient if the employer has the *right* to do so."  Rev. Rul. 87-41 at *4 (emphases added).

The Commission's finding that there was "sufficient evidence of control that [Amazon] exerts over [all] its Flex drivers" was supported by the evidence.  Indeed, the Commission, throughout its decision, found that the terms of the Agreement, as manifested in Diggs's experiences, gave Amazon a degree of control suggestive of an employer-employee relationship.  Accordingly, the Commission reasonably found that, based on these same terms, all Flex drivers were subject to Amazon's control, sufficient for those drivers, like Diggs, to be classified as employees.

Amazon also notes that a change in the text of Code § 60.2-212(C), effective July 1, 2020, required that the Commission "assess independent-contractor status under the prevailing 'standard used by the Internal Revenue Service.'"  Therefore, the new statute does not expressly mandate use of the 20 factors and thus, Amazon further argues, the Commission's "determination under the old standard cannot apply to work performed on or after July 1, 2020."

Amazon cites no authorities to support its bare assertion that the Commission's decision must be vacated as to all work performed by Flex drivers on or after July 1, 2020.  Likewise,

---

[14] To the extent that the Commission generalized Diggs's experiences to all Flex drivers, it did not err in doing so.  The evidence established a nexus between Diggs's experiences and the Agreement sufficient to support the Commission's determination that, because "the terms and conditions of the Agreement apply equally to all Flex drivers," Amazon misclassified all such Flex drivers, including Diggs, for unemployment tax purposes.

Amazon does not address in any detail how the statutory changes would have impacted the Commission's decision. Instead, Amazon merely asserts that "[t]he IRS no longer uses the 20-factor test and, instead, conducts a holistic analysis that gives greater weight to how the parties define their relationship and whether the worker receives benefits." It baldly concludes, without further analysis, that the Commission's "determination under the old standard cannot apply to work performed on or after" the new statute went into effect.

Because Amazon's claims were not "fully developed in [its] brief, we need not address" them. *Buchanan v. Buchanan*, 14 Va. App. 53, 56 (1992). Thus, we find that these claims are defaulted. *See Williams v. Commonwealth*, 57 Va. App. 750, 768 n.3 (2011) ("Statements unsupported by argument, authority, or citations to the record do not merit appellate consideration." (quoting *Buchanan*, 14 Va. App. at 56).[15]

## CONCLUSION

We hold that the Commission's factor determinations were not, as Amazon contends, unsupported by evidence and contrary to the law. Accordingly, these determinations are binding and impervious to revision by reviewing courts. Moreover, the Commission's finding that Diggs, and all Flex drivers, were employees, was also supported by the evidence. It is for these reasons that we affirm the judgment of the circuit court.

*Affirmed*.

---

[15] Nevertheless, to test Amazon's claim would require that this Court apply the new standard and find that the Commission's determination does not apply. The General Assembly has assigned the Commission, not this Court, the role of determining whether an individual "is not an employee for purposes of the Federal Insurance Contributions Act and the Federal Unemployment Tax Act." Code § 60.2-212(C). What is more, Amazon failed to make a showing that application of the new standard would have yielded a different result.